JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Kevin Dominic appeals from his convictions for rape, gross sexual imposition and felonious sexual imposition. For the reasons set forth below, we affirm.
 {¶ 2} On November 10, 1993, defendant was indicted pursuant to a five-count indictment in connection with the alleged sexual abuse of his biological children. Counts One, Two and Three charged defendant with the rape with force or threat of force upon a child under the age of thirteen, i.e., a daughter who was born in 1983 (hereafter referred to as "the younger daughter"). Count Four charged him with gross sexual imposition upon a child under the age of thirteen, i.e., a daughter who was born in 1981 (hereafter referred to as "the older daughter"), and Count Five charged him with felonious sexual penetration with force or threat of force upon the older girl while she was under the age of thirteen.
 {¶ 3} Following the girls' disclosures in 1993, defendant wrote the girls' mother a letter in which he stated that he planned to drown himself and that "[b]y the time you read this letter it will be too late and I will have been dead some time now."
 {¶ 4} In 2004, defendant was apprehended in Broward County Florida where he had been living under the name "Kevin Thompson." The matter proceeded to a jury trial on November 30, 2004.
 {¶ 5} The state presented the testimony of the younger girl, the older girl, a third daughter, the girls' mother, their stepfather, social worker William Myers, pediatric nurse practitioner Marcia Thompson, Ohio Parks and Recreation Officer Joseph Soukop, F.B.I. Special Agent Douglas Williams, Broward County Sheriff's Det. Daniel Schneider, and Wyonnene Carroll.
 {¶ 6} The younger girl testified that she was born in 1983 and is twenty-one years old and that defendant is her biological father. When she was nine years-old, she watched a frightening movie then went to sleep. She awoke from a nightmare and climbed into her parents' bed. After her mother left for work, she was awaked by defendant on top of her rubbing her chest and rubbing her vagina. She further testified that he "stuck his fingers in my vagina and then he took his penis and he put it in my vagina and started going up and down."
 {¶ 7} On another occasion, they had milkshakes and were watching a movie together. The other children had fallen asleep. Defendant called her over to the couch and told her to get under the blankets. He began rubbing her chest and vagina then took his penis out. According to the witness, he "put it in my butt and then told me to put it in my vagina." The girl said that she needed to go to the bathroom then locked herself in the bathroom. She urinated and defendant licked her vagina then put his penis in her mouth.
 {¶ 8} In a third incident, he called her upstairs and told her to get into bed. He touched her breasts and vagina. He inserted his fingers into her vagina then inserted his penis into her vagina.
 {¶ 9} The girl testified that there were "quite a few" instances of abuse, including an incident where defendant sucked her breasts and told her that this would make them grow faster. The witness stated that she did not tell her mother about the abuse because she was afraid of defendant because he was violent to her mother.
 {¶ 10} The witness next testified that her mother left defendant in 1993 and they moved in with a neighbor, who is now her stepfather. The witness had visitation with defendant and following a visit, the girl experienced her first menstrual cycle. She did not know what was happening and she feared that the sexual abuse had caused injuries. She told her older sister about the abuse and she in turn told their mother. The girl's mother questioned the younger girl and she initially denied that anything inappropriate had happened. She later told her mother that defendant had inserted his penis into her and her mother then took her to the hospital.
 {¶ 11} The older girl testified that she was born in 1981, and is twenty-three years old. She stated that defendant was always abusive to her mother and that she once saw him strike her with a frying pan. She further testified that defendant would put her in bed with him put his fingers in her vagina and have her rub his penis. In 1993, when she was twelve, her class had sexual education, she was instructed that private parts should be touched only by consenting adults. At this time, she realized that her father had been touching her inappropriately. She then told her mother what had been happening and she called him at work. According to the girl, defendant immediately returned from work took her up to the bedroom, held a rifle to her head and threatened to kill her. The girl then promptly told her mother that he did not molest her and that she "took back" the allegation.
 {¶ 12} This witness further testified that, after her parents were separated, she refused to visit with her father. The younger girl and other siblings did visit with him, however. Following one such visitation, the younger girl got her menstrual period and expressed fear that her bleeding was related to defendant's having had sex with her. The girl told her mother that defendant had fondled her at an earlier time and that the younger girl was crying and said that defendant had molested her.
 {¶ 13} The mother testified that she and defendant married in 1979 and had five children. She stated that during the marriage, at a point when the woman was sleeping on the couch, the older girl told her that defendant was hurting her. The woman called defendant at work and he came home from work and spoke to the girl alone. She then told her mother that it was just a nightmare.
 {¶ 14} The woman further testified that defendant had a .22 rifle and a shotgun, and was physically and verbally abusive. According to the woman, the older girl once witnessed an incident when defendant hit the woman. She asked defendant for a divorce and he threatened to kill her, the children and himself. The woman filed for a separation and she and the children moved in with her neighbor Ron Sobiech.
 {¶ 15} During the separation, the older girl refused to visit with her father. The younger girl visited with her father, and upon returning home, she experienced her first menstrual cycle. She began to cry and told the woman that defendant had sexual intercourse with her. At this time, the older girl also stated that defendant had fondled her at an earlier time.
 {¶ 16} The woman called the police then took the younger girl to University Hospital. She also met with a social worker from the county. She stated that she did not bring the older girl to the hospital because the girl stated that she had not been penetrated.
 {¶ 17} Later, in July 1993, defendant arrived at Sobiech's home to pick up the children for visitation but the woman refused to let them go. He appeared frightened and later that month, the woman received a suicide note from defendant which stated:
 {¶ 18} "By the time you read this letter it will be too late and I will have been dead some time now. When you find out that they both are still then it will be too late. I didn't change the union yet so you will still get all the death benefits. I going [sic] swimming to see if I can cross lake. Don't show this letter to the kids. See you in the hereafter. Love, Kevin. Don't look for my body."
 {¶ 19} The woman also received defendant's bank records for August 1993 and forwarded them to Special Agent Williams.
 {¶ 20} Parks and Recreation Safety Officer Joseph Soukop testified that on August 2, 1993, he towed defendant's vehicle from the parking lot of Edgewater Beach. At this time, he learned that defendant was wanted on an outstanding warrant for rape. According to Soukop, the car contained various items including a cross, photographs and children's mementos.
 {¶ 21} Social Worker William Myers testified that in July 1993, he worked as an intake worker in the sex abuse unit of the Department of Children and Family Services. He met with both girls regarding their molestation accusations and prepared reports of those interviews. According to Myers, the younger girl was open and forthcoming and reported that defendant had put his private part into her "peach" after she had a nightmare. She also reported that defendant put his penis inside her "butt" and that the abuse occurred nine or ten times. The older girl reported that she had gone to her parents' room because she did not feel well and defendant digitally penetrated her, moving his finger in and out. He then put her hand on his penis then wiped it off with a cloth.
 {¶ 22} Nurse practitioner Marcia Thompson testified that she has been employed at MetroHealth since 1987. In 1993, she worked in the hospital's Alpha Clinic and had, as of that time, examined approximately 1,800 suspected victims of child sexual abuse. Examination of the older girl revealed no abnormalities but, according to Thompson, this does not exclude the possibility of abuse. Examination of the younger girl was also within normal limits. Finally, Thompson testified that physical findings are present in fewer than ten percent of all child sexual abuse cases.
 {¶ 23} Another daughter, Jessica, testified that defendant beat and paddled her but she had no recollections pertinent to her sisters' molestations allegations.
 {¶ 24} The girls' stepfather, Ron Sobiech, testified that the woman and her children moved in with him because she wanted to divorce defendant but was afraid. A romantic relationship developed and in 1994, he married the woman. He acknowledged taking firearms from defendant's home.
 {¶ 25} F.B.I. Special Agent Douglas Williams testified that in 1993 he was assigned to the fugitive task force and volunteered to locate defendant. He received the July 1993 suicide letter from defendant's former wife, and obtained a similar letter that was sent to his parents. Later, defendant's former wife provided him with a bank statement which showed transactions that had occurred following the mailing of the letters, including a withdrawal from an ATM at Cleveland Hopkins International Airport on August 6, 1993. A photograph from this transaction depicts defendant. Agent Williams ran out of leads and the case was later profiled on Unsolved Mysteries. In May 2004, he learned that sheriffs in Florida located him.
 {¶ 26} Wyonnene Carroll testified that she met defendant, who she knew as "Kevin Thompson" in 1999. Defendant told her that he was a widower. After three of four months they began to live together. According to Carroll, defendant did not have any identification and was paid in cash by his employer. Carroll and defendant eventually made plans to marry and she applied for him to receive a birth certificate. She subsequently received a birth certificate listing defendant's name as "Kevin Dominic" and he explained that he had been raised by his grandparents. Carroll became suspicious of defendant and had a friend who works for the Indianapolis Police Department investigate defendant. Approximately one week later, the police arrived at her home, asked for the birth certificate, and arrested defendant.
 {¶ 27} Carroll additionally testified that defendant had, in anger, broken things at the home, and had also grabbed her son by the throat.
 {¶ 28} Broward County Sheriff's Det. Daniel Schneider testified that on May 10, 2004, he was assigned to locate a fugitive wanted in Ohio. Schneider subsequently confronted defendant. Defendant provided the detective with his real name and was arrested. Schneider also received defendant's birth certificate from Carroll.
 {¶ 29} Defendant presented the testimony of Mary Ann Kaminicki who testified that after defendant was gone from the home, the girls' mother confided in her that defendant had molested two of the girls, then later confided that she had feelings for Sobiech.
 {¶ 30} Annie Thornton testified that she lived across from the home defendant shared with the children and she observed the children's mother go to Sobiech's house after work.
 {¶ 31} Defendant was subsequently convicted of rape as charged in Count One of the indictment, gross sexual imposition and felonious sexual penetration. Defendant was sentenced to consecutive terms of life in prison on the rape charge, four to ten years for gross sexual penetration and life for felonious sexual penetration. He was also adjudicated a sexual predator. Defendant now appeals and assigns five errors for our review.
 {¶ 32} Defendant's first assignment of error states:
 {¶ 33} "Prejudicial error was committed by the admission of other acts testimony in violation of R.C. 2945.59, Evid.R. 404(B) and the Appellant's rights under Article I, Section 16 of the Ohio Constitution and the Fourteenth Amendment of the United States Constitution."
 {¶ 34} Within this assignment of error, defendant complains that the trial court erred in permitting the state to admit evidence that he was abusive to the girls' mother, that the older girl witnessed such abuse and that the younger girl feared defendant for this reason.
 {¶ 35} Evid.R. 404(B) provides that evidence of other acts is not admissible to prove the character of a person in order to show that the accused acted in conformity therewith. Evidence of other bad acts is generally prejudicial and generally is prohibited by Evid.R. 404(B). See, e.g., State v. Curry (1975),43 Ohio St.2d 66, 68-69, 330 N.E.2d 720.
 {¶ 36} "While `other acts' evidence may not be used to prove criminal propensity, such evidence may be admissible `if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove notice, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" State v. Lowe,69 Ohio St.3d 527, 530, 1994-Ohio-345, 634 N.E.2d 616; see, also, Evid.R. 404(B); R.C. 2945.59. Further, under Evid.R. 404(B) and R.C. 2945.59, evidence of other acts is admissible if it tends to prove a specific element of the crime charged. State v. Smith
(1990), 49 Ohio St.3d 137, 139-140, 551 N.E.2d 190.
 {¶ 37} Generally, "an accused cannot be convicted of one crime by proving he committed other crimes or is a bad person."State v. Jamison (1990), 49 Ohio St.3d 182, 552 N.E.2d 180. Consequently, "evidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity." Id.
 {¶ 38} "The purpose behind this rule is to prevent an accused from being placed in the unenviable position of having to defend him or herself for two distinct offenses at trial: those crimes which the accused is currently on trial for, and additional illegal activity that the accused allegedly committed in the past." State v. Kanetsky (June 11, 1999), Trumbull App. No. 97-T-0162. Moreover, "a criminal conviction cannot be based, in whole or in part, upon the `bad character of the defendant theory.'" State v. Pollard (April 13, 2001), Ashtabula App. No. 99-A-0072. Due to the "possible prejudicial effect that extrinsic acts evidence may have in the minds of the trier of fact, Evid.R. 404(B) and R.C. 2945.59 must be strictly construed against admissibility." State v. Swick (December 21, 2001), Lake App. No. 97-L-254.
 {¶ 39} Finally, we note that "the admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343, paragraph two of the syllabus; see, also, State v. Bey,85 Ohio St.3d 487, 490, 1999-Ohio-283, 709 N.E.2d 484. Where an error in the admission of evidence is alleged, appellate courts do not interfere unless it is shown that the trial court clearly abused its discretion. State v. Maurer (1984),15 Ohio St.3d 239, 473 N.E.2d 768. Thus, the admission or exclusion of evidence, including the admission of other acts evidence, lies within the trial court's sound discretion. State v. Bey, supra.
 {¶ 40} In State v. Eskridge (1988), 38 Ohio St.3d 56,526 N.E.2d 304, the Ohio Supreme Court recognized that the force in R.C. 2907.02(B) "need not be overt and physically brutal, but can be subtle and psychological." Id. at 58. The court stated that "the force and violence necessary in rape is naturally a relative term, depending upon the age, size and strength of the parties and their relation to each other." Id. The court found nothing unreasonable about a finding that a child's will was overcome by fear and duress when an important figure of authority told the child to do something, and commanded the child not to tell anyone about it. Id. at 59. According to the court, "as long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." Id.
 {¶ 41} In this matter, defendant was accused of rape by force or threat of force in violation of R.C. 2907.02. The testimony of the girls and their mother indicated that defendant regularly engaged in the physical and mental abuse of the mother and that he possessed weapons. The evidence was therefore relevant to the element of force, and was inextricably related to the charge of rape and gross sexual imposition. State v. Williamson, Cuyahoga App. No. 80982, 2002-Ohio-6503; State v. William (Oct. 7, 1999), Cuyahoga App. No. 74840. See, also, State v. Martin
(Dec. 6, 1990), Cuyahoga App. No. 58648; State v. Black (Feb. 10, 1994), Cuyahoga App. No. 64686. Cf. State v. Rankin,
Clinton App. No. CA2004-06-015, 2005-Ohio-6165. Accordingly, this assignment of error is without merit.
 {¶ 42} Defendant's second assignment of error states:
 {¶ 43} "The Appellant was denied due process of law when the trial court would not instruct upon the lesser included offense of gross sexual imposition for felonious sexual penetration."
 {¶ 44} We note that courts have concluded that, gross sexual imposition, defined in R.C. 2907.05 is in fact a lesser included offense of the indicted offense of felonious sexual penetration, defined in R.C. 2907.12. See State v. McCown (Oct. 31, 1996), Cuyahoga App. No. 69683, citing State v. Aiken (June 10, 1993), Cuyahoga App. No. 64627, unreported; State v. Polk (May 17, 1979), Cuyahoga App. No. 38832, unreported.
 {¶ 45} However, even though an offense may be statutorily defined as a lesser included offense of another, a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. State v. Thomas (1988), 40 Ohio St.3d 213, 216,533 N.E.2d 286, certiorari denied (1989), 493 U.S. 826; State v.Kidder (1987), 32 Ohio St.3d 279, 513 N.E.2d 311.
 {¶ 46} In State v. Johnson (1988), 36 Ohio St.3d 224,522 N.E.2d 1082, the Supreme Court rejected the defendant's claim that the trial court erred in failing to instruct the jury on gross sexual imposition as a lesser included offense of rape where defense was a complete denial that any of the charged events ever took place; i.e., an "all-or-nothing" defense. The Court stated:
 {¶ 47} "Under no reasonable view of the evidence could the jury have found against the state on the issue of intercourse or penetration and still have found for the state on the remaining elements of gross sexual imposition, i.e., `sexual contact.'" Id. at 226.
 {¶ 48} Likewise in State v. Fulkerson, Cuyahoga App. No. 83566, 2004-Ohio-3114, this court held that an instruction on the lesser offense of gross sexual imposition would be confusing to the jury and therefore would not be given where the defendant denied that any sexual act had occurred.
 {¶ 49} In this matter, the defense presented that the allegations of sexual abuse were completely untrue and were lodged to facilitate the termination of defendant's marriage to the mother of the girls. Accordingly, the evidence could not have supported both an acquittal of felonious sexual penetration and a conviction on the lesser-included offense of gross sexual imposition. The trial court did not err in refusing to instruct on the offense of gross sexual imposition as a lesser included offense of felonious sexual penetration.
 {¶ 50} This assignment of error is without merit.
 {¶ 51} Defendant's third assignment of error states:
 {¶ 52} "The convictions are against the manifest weight of the evidence."
 {¶ 53} In evaluating a challenge to the verdict based on manifest weight of the evidence, a court sits as the thirteenth juror, reviews the factfinder's resolution of the evidence and considers whether the jury "lost its way." State v. Thompkins,78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The Thompkins
Court explained:
 {¶ 54} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' * * *
 {¶ 55} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387.
 {¶ 56} In this matter, the state presented that when the younger girl was nine, she went to her parents' bed after having a nightmare and was awaked by defendant on top of her rubbing her chest and rubbing her vagina. He then "stuck his fingers in my vagina and then he took his penis and he put it in my vagina and started going up and down." The state also presented evidence that after the other children had fallen asleep defendant called the younger girl over to him, told her to get under the blankets, and began rubbing her chest and vagina. He raped the girl and she fled to the restroom where he then licked her vagina then put his penis in her mouth.
 {¶ 57} In a third incident, he called her upstairs and told her to get into bed. He touched her breasts and vagina. He inserted his fingers into her vagina then inserted his penis into her vagina.
 {¶ 58} The girl also related an incident where defendant sucked her breasts and told her that this would make them grow faster. The girl informed her mother of the abuse following the onset of her first menstrual cycle because she feared that defendant's conduct had caused her to sustain injuries.
 {¶ 59} The older girl testified that defendant would put her in bed with him, put his fingers in her vagina and have her rub his penis. In 1993, when she was twelve, her class had sexual education, she was instructed that private parts should be touched only by consenting adults. At this time, she realized that her father had been touching her inappropriately and told her mother. Defendant confronted the girl, privately held a rifle to her head, and threatened to kill her. The girl recanted but refused to visit her father following her parents' separation.
 {¶ 60} The evidence further indicated that defendant faked his own death following the reporting of this matter to police and that he fled to Florida and lived under an assumed name until he was finally captured in 2004.
 {¶ 61} Evidence offered by defendant indicated that his former wife may have had romantic feelings for Sobiech during her marriage to defendant and that she moved in with Sobiech following the girls' disclosures.
 {¶ 62} Our review of the entire record leads us to conclude that the jury did not lose its way and did not create a manifest miscarriage of justice in convicting defendant in this matter. The testimony of the girls was detailed, clear, consistent and forthright and established the offenses at issue. The state's remaining witnesses were unbiased, clear, and thorough. Moreover, defendant's evidence addressed the offenses only indirectly. Accordingly, we conclude that the jury correctly determined that the greater amount of credible evidence supports the evidence offered by the state and the convictions are not against the manifest weight of the evidence.
 {¶ 63} The third assignment of error is without merit.
 {¶ 64} Defendant's fourth assignment of error states:
 {¶ 65} "The trial court erred by sentencing the Appellant to an indefinite term of four to ten years for the gross sexual imposition charge."
 {¶ 66} Within this assignment of error, defendant asserts that the trial court acted contrary to the requirements of R.C.2929.11 in imposing an indefinite term of imprisonment on the gross sexual imposition charge because there was no requisite finding that defendant was also guilty of a violence specification under R.C. 2941.143. The State of Ohio concedes that an indefinite term was erroneously imposed and it acknowledges that defendant was subject to a term of imprisonment of one, one and one-half, or two years imprisonment for this offense.
 {¶ 67} Accordingly, this assignment of error is well taken and the matter must be remanded for re-sentencing as to this offense.
 {¶ 68} Defendant's fifth assignment of error states:
 {¶ 69} "The evidence was insufficient as a matter of law to prove by clear and convincing evidence Appellant is likely to engage in the future in one or more sexually oriented offenses."
 {¶ 70} A sexual predator is defined in R.C. 2950.01(E) as a person who has been convicted of or pled guilty to committing a sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses. In order to classify an offender as a sexual predator, the court must find by clear and convincing evidence that an offender is likely to commit a sexually oriented offense in the future. R.C. 2950.09(B)(4).
 {¶ 71} In State v. Eppinger, 91 Ohio St.3d 158, 164, 2001-Ohio-247, 743 N.E.2d 881, the Ohio Supreme Court defined the clear and convincing evidence standard as follows:
 {¶ 72} "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
 {¶ 73} In reviewing a trial court's decision based upon clear and convincing evidence, an appellate court must examine the record to determine whether sufficient evidence exists to satisfy the requisite degree of proof. State v. Schiebel (1990),55 Ohio St.3d 71, 74, 564 N.E.2d 54.
 {¶ 74} Pursuant to R.C. 2950.09(B)(3), in making a determination as to whether an offender is a sexual predator, the trial court must consider all relevant factors, including but not limited to the following: the offender's age and prior criminal record, the age of the victim, whether the sexually oriented offense involved multiple victims, whether the offender used drugs or alcohol to impair the victim, whether the offender completed any sentence imposed for any conviction, whether the offender participated in available programs for sexual offenders, any mental disease or disability of the offender, whether the offender engaged in a pattern of abuse or displayed cruelty toward the victim, and any additional behavioral characteristics that contribute to the offender's conduct. R.C. 2950.09(B)(3)(a) through (j).
 {¶ 75} R.C. 2950.09(B) does not require that each factor be met; it simply requires the trial court consider those factors that are relevant. State v. Cook, 83 Ohio St.3d 404, 426, 1998-Ohio-291, 700 N.E.2d 570; State v. Grimes (2001),143 Ohio App.3d 86, 89, 757 N.E.2d 413.
 {¶ 76} In this matter, the state maintained that defendant was convicted of sexual offenses against his biological daughters in a continuing course of conduct and that he displayed cruelty by threatening the older child with a shotgun and verbally threatening the younger girl. In addition, the state presented the testimony of Wyonnene Carroll, defendant's live-in girlfriend who testified that in November and December 2003, she became suspicious of defendant's true identity and searched his dresser. She found two pages of child pornography which depicted prepubescent children in sexually explicit positions. When Carroll confronted defendant, he denied possessing the photographs then suggested that a neighbor had planted them there. In another incident, defendant removed the hard drive from the home computer and instructed Carroll's son to destroy it with a hammer. Finally, she testified that defendant had physical altercations with her ten year-old son, leaving marks around the boy's neck.
 {¶ 77} The defense offered the results of a STATIC 99 evaluation, an actuarial tool for predicting likelihood of re-offending, which indicated that defendant was in the category of the least likely to re-offend, i.e., thirteen percent over fifteen years.
 {¶ 78} The trial court subsequently determined that defendant's age, lack of criminal record, lack of mental illness, and the absence of drug or alcohol involvement weighed against the likelihood that defendant would re-offend. Nonetheless, the court determined that the age of the victims, the fact that there were more than one victim, the demonstrated pattern of abuse, the threats, defendant's reported history of sexual abuse, and history of alcohol and marijuana use, plus Carroll's testimony regarding defendant's possession of child pornography and defendant's abuse of her son supported the conclusion that defendant would likely re-offend.
 {¶ 79} We find that clear and convincing evidence supports the trial court's determination that defendant is a sexual predator. The record as a whole establishes by clear and convincing evidence that defendant is likely to commit a sexually oriented offense in the future, given the nature and circumstances of the offense for which he was convicted, including two victims, their ages, the pattern of abuse, threats including threatening the older girl with a rifle, recent possession of child pornography and physical abuse of Carroll's son.
 {¶ 80} This assignment of error is without merit.
 {¶ 81} The convictions are affirmed, the sentence for gross sexual imposition is reversed, and the matter is remanded for re-sentencing as to this offense.
It is ordered that appellee and appellant split the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Rocco, J., and Blackmon, J., concur.